UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| JASON/JENNA HANSEN,<br><br>                Plaintiff,<br><br>vs.<br><br>SAM BADURE, KEN VANMEVEREN, JUSTIN HAWK, CATHY WYNIA, RICK LESLIE, TROY ELLIS, DEREK EKEREN, DARIN YOUNG, DEB EILERS, NANCY CHRISTENSEN, ROBERT DOOLEY, BRENT FLUKE, DENNIS KAEMINGK, MIKE LEIDHOLT, HEATHER BOWERS, CORY NELSON, CHRIS TURBAK, KAYLEN THELEN, JENNY ENGLAND and TIFFANY WOLFGANG, in their official and individual capacities,<br><br>                Defendants. | 4:19-CV-04019-KES<br><br>ORDER GRANTING MOTION TO AMEND AND 1915A SCREENING |

Plaintiff, Jason/Jenna Hansen filed a pro se civil rights complaint under 42 U.S.C. § 1983. Docket 1. This court granted Hansen leave to proceed in forma pauperis. Docket 5. Hansen filed a motion to amend his complaint Docket 11. Hansen's motion to amend (Docket 11) is granted and the 1915A screening will focus on Hansen's amended complaint (Docket 11-1).

**FACTUAL BACKGROUND**

The facts as alleged in the amended complaint are: Hansen was born male and was named Jason Hansen. Docket 11-1 ¶ 26. "[S]ince early

1

childhood, she has believed she is a female named Jenna, confined in a man's body." *Id.* She has "suffered from symptoms of Gender Identity Disorder (GID) or Gender Dysphoria since she can remember[.]" *Id.* ¶ 28. Hansen believes her GID was caused from her being sexually abused as a child and from being raped by her boss in 1996. *Id.*

Hansen was first incarcerated in 1998. *Id.* ¶ 27. She has been requesting relief orally, by kites, and by the prison's grievance process since 2000. *Id.* ¶ 39. She attempted suicide in 2009 and attempted castration in 2014 and 2016. *Id.* ¶¶ 40, 41. In 2018, Hansen inflicted self-harm in hopes that it would be a release from her depression. *Id.* ¶ 55.

In 2017, Cory Nelson, the Clinical Supervisor of the Correctional Behavioral Health (BH), issued a report that diagnosed Hansen with gender dysphoria. *Id.* ¶ 43. The report shows that she met the criteria defining GID. *Id.* Nelson knew about her requests to " 'wear makeup, have hormones, and . . . talk to someone regarding gender reassignment surgery.' " *Id.* Further, Nelson sent his report to the " 'Department of Social Services (DSS), Asst. Director Correctional Behavioral Health; DSS Behavioral Health Division Director; Warden [of MDSP]; and Association Warden (AW) [of MDSP].' " *Id.* (alterations in original).

Cynthia Osborne, Psychotherapist and Assistant Professor in the Department of Psychiatry and Behavioral Sciences at John Hopkins University evaluated her on October 29-30, 2018. *Id.* ¶ 56. On June 12, 2019, Hansen received a letter from Jenny England, Assistant Director of BH, that stated

2

" '[t]hrough the evaluation you participated in with the gender dysphoria consultant it was determined that you met clinical criteria for gender dysphoria.' " *Id.* ¶ 75 (alteration in original). Behavioral staff members Chris Turbak, Kayla Tinker, and England denied Hansen access to the report that was prepared by Osborne. *Id.* ¶ 56.

The Department of Corrections (DOC) policy creates a "Gender Non-Conforming Committee" (GNC), which determines how the inmate is to be defined and how he/she will be treated. *Id.* ¶ 34. The members of the committee are

> PREA [Prison Rape Elimination Act (PREA)] Compliance Manager, Sam Badure; Director of Classification, Rick Leslie; Warden, Robert Dooley/ Brent Fluke and Darin Young; PREA Coordinator, Ken VanMeveren; Behaviorial Health, Cory Nelson, Chris Turbak, Kayla Thelen, Jenny England, and/or Tiffany Wolfgang; Health Services, Heather Bowers; Facility PREA Investigator, Justin Hawk or Cathy Wynia; Unit Manager, Nancy Christensen and Troy Ellis; and Security, Justin Hawk or Cathy Wynia.

*Id.* ¶ 35. The GNC is required to meet when an inmate identifies as transgender or "when she 'has submitted a request concerning any issue which the [GNC] has authority to take action on' . . . . which include: medical screening, analysis of behavioral health, refer to a consultant, separate showers . . . separate searches, and other requested issues/complaints." *Id.* ¶ 36 (alteration in original). Hansen has requested relief from the unit, BH staff at MDSP, and from staff at SDSP through kites, oral requests, and the grievance process. *Id.* ¶ 39.

Hansen did not receive responses to her 2018 requests for sports bras, testosterone blockers, boxer briefs, and estrogen pills. *Id.* ¶¶ 49-54. In

3

February of 2019, Hansen was "denied private showers, private searches, and the use of an electric razor, after having identified herself as transgender and therefore entitled because she would otherwise suffer psychological harm." *Id.* ¶ 57. Hansen's request for permanent body hair removal was also rejected. *Id.* ¶ 58.

In March of 2019, Hansen's requests for private searches, medication for hair growth, an electric razor, and private showers were rejected by Derek Ekeren because she did not submit the proper paperwork. *Id.* ¶ 59. Hansen then complied with the proper form, but the requests were still rejected because they exceeded the ten-day time limit. *Id.* Hansen argues that requests for PREA investigations are not subject to the same time restrictions as the normal grievance process under the DOC policy. *Id.* Hansen received a disciplinary report from correctional officer, Derrick Godby, on April 9, 2019, because she had a " 'home made (sic) tank top [and] 2 pairs of home made (sic) underwear.' " *Id.* ¶ 61.

On or about April 18, 2019, Hansen met with Turbak from the BH offices and requested the ability to possess the same items as female prisoners. *Id.* ¶ 62. Turbak told Hansen that there was no reference to Hansen's diagnosis of gender dysphoria and it was not in her examination report by Osborne. *Id.* Turbak told Hansen that England said that Hansen was not allowed to access her mental health records. *Id.*

Hansen repeatedly submitted kites and oral requests to Eilers, Christensen, and Nelson to be allowed to wear makeup. *Id.* ¶ 45. She received a

response from Christensen that was endorsed by Warden Robert Dooley, that stated there was no BH order allowing Hansen to wear makeup. *Id.* Hansen has been written-up multiple times for wearing makeup. *Id.* ¶¶ 42, 46, 47. When Hansen darkened her eyebrows, correctional officer Kelly Tjeersdsma sanctioned her with a violation of V-16 and at the hearing for the violation, unit coordinator Eilers sanctioned Hansen with a fine. *Id.* ¶ 47. Rule V-16 states that an inmate's "[c]onduct which disrupts or interferes with the security or good order of the institution; interfering with a staff member in the performance of his/her duties" is considered a prison violation. Docket 11-2 at 28.

On May 18, 2018, Hansen requested a sports bra. Docket 11-1 ¶ 54. She claims her informal resolution request (IRR) was rejected by Eilers, and Christensen received the administrative remedy request (ARR) a few days later. *Id.* Hansen's requests for estrogen pills and boxer briefs were allegedly responded to by Eilers and Christensen. *Id.* ¶¶ 52, 53. On April 30, 2019, Hansen attended sick call and requested

> (1) estrogen meds; (2) testosterone blocker meds; (3) sports bras; (4) boxer briefs; (5) makeup from [female] commissary; (6) 'GNC shower' in SHU; (7) single strip searches; (8) body hair removal; (9) head hair regrowth hormones; (10) copies of her BH and HS medical files; and (11) a pillow.

*Id.* ¶ 63. This list was sent to the SDSP behavioral health. *Id.*

Hansen believes that she is transferred frequently because of having gender dysphoria. *Id.* ¶ 64. She was transferred in 2001, 2009, 2010, 2012,

5

2016, 2016, 2019. *Id.* Unit coordinator Angela Steinike stated she did not have time to take Hansen's grievances and that Hansen had exceeded the 30-day time limit. *Id.* ¶ 65. Hansen alleges that this interaction prevented her from filing more grievances. *Id.*

In April of 2019, Hansen requested to meet with the PREA Auditor, Diane Lee, and sent her a letter to schedule a meeting. *Id.* ¶ 66. She told Lee about her complaints. *Id.* Hansen sent PREA Coordinator VanMeveren a kite to ask for a meeting to be scheduled with Lee as well. *Id.* Hansen did not have a meeting with Lee when she performed the audit. *Id.* ¶ 68.

In May of 2019, unit manager Sam Badure called Hansen to his office to discuss the GNC and the showering/strip searches that Hansen has dealt with. *Id.* ¶ 67. During the meeting with Badure, Hansen explained that she was transgender and "should not be required to strip or shower in view of other inmates" and "she was both required to strip and shower in view of other inmates." *Id.* Badure responded "in an arrogant manner, that 'they' were found to be in compliance with PREA Standards during their [April 21-25, 2019] audit and dismissed the allegations of Ms. [Hansen] without investigation[]." *Id.*

On May 29, 2019, Hansen individually addressed envelopes to Badure, VanMeveren, Hawk, Wynia, Leslie, Young, Kaemingk, Leidholt, Bowers, Nelson, Turbak, Thelen, England, and Wolfgang that she has "repeatedly asked to be designated as having been diagnosed with Gender Dysphoria, and because [d]efendants refused to make such a designation on the record she has received disciplinary reports and had been sanctioned." *Id.* ¶ 69.

6

Hansen was called to Assistant Warden Troy Ponto's office on June 3, 2019, and was handed the May 29 envelope addressed to Warden Young. *Id.* ¶ 71. When Ponto asked Hansen what she wanted in response to the letter, Hansen articulated the relief sought laid out in this amended complaint and Ponto allegedly said that " 'they' had nothing to do with the relief she sought, rather that was up to Ms. Wolfgang." *Id.* On June 6, 2019, Hansen sent letters that were identical to her May 29th letters to Ellis, Ekeren, Eilers, Christensen, and Fluke. *Id.* ¶ 72. On June 7, 2019, Turbak showed Hansen a copy of Cynthia Osborne's report. *Id.* ¶ 73. Again, on June 12, 2019, Hansen claims: (1) she saw the report by Osborne but Turbak told her she could not copy the report or take notes, and (2) she allegedly received a letter from England, which stated " '[t]hrough the evaluation you participated in with the gender dysphoria consultant it was determined that you met clinical criteria for gender dysphoria.' " *Id.* ¶¶ 74, 75. The report showed that she was "suffering from gender dysphoria, and Ms. Osborne recommended Ms. Hansen be allowed makeup, other feminine accommodations, feminine undergarments, hormone treatment, and hair removal." *Id.* ¶ 74. On June 14, 2019, Hansen received a response to her request for an endocrinologist appointment and to receive " 'hormone meds and testosterone blockers.' " *Id.* ¶ 76. Hansen's request was denied because her " 'report [indicating a gender dysphoria diagnosis] ha[d] not been submitted yet; and therefore they could do nothing for Ms. Hansen.' " *Id.*

Hansen contends that the DOC policy required "Ellis, Ekeren, Eilers, and Christensen, who were all aware of Ms. Hansen's kites and grievances

7

requesting the relief sought by this action, to notice GNC of Ms. Hansen's requests/complaints, none did so." *Id.* ¶ 77. Hansen believes that the responses to her grievances submitted by Eilers, Christensen, Dooley, Ekeren, and Ellis prevented her from appearing before the GNC or having her grievances taken to the BH staff. *Id.* ¶ 78.

Hansen claims to have exhausted all available administrative remedies on these claims. *Id.* ¶ 83. Hansen believes that the GNC committee, Badure, VanMeveren, Hawk, Wynia, Leslie, Ellis, Young, Christensen, Dooley/Fluke, Bowers, Nelson, Turbak, Thelen, England, and Wolfgang failed to respond or act upon her requests and this prevented Hansen from receiving the relief she has requested in this amended complaint. *Id.* ¶ 79. Further, Hansen alleges that the BH staff, Nelson, Tubak, Thelen, England, and Wolfgang prevented her from receiving treatment and relief when they had direct contact with Hansen and knew of her requests. *Id.* ¶ 80. Hansen claims she has "not been offered any of the treatment necessary as a remedy for her disorder and has in fact been denied the assignation of being transgender and suffering from gender dysphoria or gender identity disorder." *Id.* ¶ 81.

## LEGAL STANDARD

The court must assume as true all facts well pleaded in the complaint. *Estate of Rosenberg v. Crandell*, 56 F.3d 35, 36 (8th Cir. 1995). Civil rights and pro se complaints must be liberally construed. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)*; Bediako v. Stein Mart, Inc.*, 354 F.3d 835, 839 (8th Cir. 2004). Even with this construction, "a pro se complaint must contain specific facts

8

supporting its conclusions." *Martin v. Sargent*, 780 F.2d 1334, 1337 (8th Cir. 1985); *see also Ellis v. City of Minneapolis*, 518 F. App'x 502, 504 (8th Cir. 2013). Civil rights complaints cannot be merely conclusory. *Davis v. Hall*, 992 F.2d 151, 152 (8th Cir. 1993); *Parker v. Porter*, 221 F. App'x 481, 482 (8th Cir. 2007).

A complaint "does not need detailed factual allegations . . . [but] requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). If it does not contain these bare essentials, dismissal is appropriate. *Beavers v. Lockhart*, 755 F.2d 657, 663 (8th Cir. 1985). *Twombly* requires that a complaint's factual allegations must be "enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true." *Twombly*, 550 U.S. at 555; *see also Abdullah v. Minnesota*, 261 F. App'x 926, 927 (8th Cir. 2008) (noting that a complaint must contain either direct or inferential allegations regarding all material elements necessary to sustain recovery under some viable legal theory). Under 28 U.S.C. § 1915A, the court must screen prisoner complaints and dismiss them if they are "(1) frivolous, malicious, or fail[] to state a claim upon which relief may be granted; or (2) seek[] monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b). The court will now assess each individual claim under 28 U.S.C. § 1915A.

**ANALYSIS**

I.  **Official Capacity Claims**

Hansen has sued each of the defendants in their official capacity. Docket 11-1 ¶ 4. As the Supreme Court has stated, "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) (citing *Brandon v. Holt*, 469 U.S. 464, 471 (1985)). Thus, it is a suit against the state itself. While "[§] 1983 provides a federal forum to remedy many deprivations of civil liberties . . . it does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties." *Id.* at 66.

The Eleventh Amendment generally acts as a bar to suits against a state for money damages unless the state has waived its sovereign immunity. *Id.* But when an official capacity claim is asserted for injunctive relief against a state officer, the defense of qualified immunity does not apply. *See Pearson v. Callahan*, 555 U.S. 223, 242-43 (2009).

Here, as part of Hansen's requested remedy, he seeks to recover money damages. Docket 11-1 at 23. Consequently, because Hansen has sued defendants in their official capacities, Hansen has asserted a claim for money damages against the state of South Dakota. The state of South Dakota has not waived its sovereign immunity. Thus, to the extent Hansen seeks to hold defendants liable in their official capacities for money damages, the court finds that defendants are protected by sovereign immunity and are entitled to

judgment as a matter of law. Hansen's claims against defendants in their official capacities for injunctive relief survive screening.

## II. Hansen's "Claim 1"

Hansen claims that defendants Badure, VanMeveren, Hawk, Wynia, Leslie, Ellis, Ekeren, Young, Eilers, Christensen, Dooley, Fluke, Bowers, Nelson, Turbak, Thelen, England, and Wolfgang in their official and individual capacities violated Hansen's First Amendment (right to freedom of expression), Eighth Amendment (right to be free from cruel and unusual punishment by deliberate indifference to her serious medical needs), and Fourteenth Amendment (right to equal protection of the laws). Docket 11-1 ¶ 85.

### A. First Amendment

Hansen alleges that defendants Badure, VanMeveren, Hawk, Wynia, Leslie, Ellis, Ekeren, Young, Eilers, Christensen, Dooley, Fluke Bowers, Nelson Turbak, Thelen, England, and Wolfgang denied her "appropriate and diagnosed gender notification," counseling, therapy, "female appropriate clothing, hygiene and other items allowed females confined in other DOC facilities." *Id.* She asserts that this deprivation violates her freedom of expression under the First Amendment. *Id.* "[A] prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974). "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). At

11

this stage, the prison has not identified a legitimate penological objective, so Hansen's freedom of expression claim survives 1915A screening.

## B. Eighth Amendment

Hansen claims that defendants Badure, VanMeveren, Hawk, Wynia, Leslie, Ellis, Ekeren, Young, Eilers, Christensen, Dooley, Fluke Bowers, Nelson Turbak, Thelen, England, and Wolfgang violated her Eighth Amendment rights by denying her diagnoses of gender dysphoria and GID to be put "upon Plaintiff's permanent records, [and denying] psychological counseling, necessary therapies, and treatments . . . and gender changing surgery." Docket 11-1 ¶ 85.

"A prima facie case alleging . . . deliberate indifference requires the inmate-plaintiff to demonstrate that [she] suffered from an objectively serious medical need and that prison officials actually knew of, but deliberately disregarded, that need." *Reid v. Griffin*, 808 F.3d 1191, 1192 (8th Cir. 2015) (internal quotation omitted). In *Reid*, the Eighth Circuit Court of Appeals upheld the district court's grant of summary judgment because Reid did not establish that the defendants' conduct constituted deliberate indifference. *Id*. Although *Reid* was decided under the summary judgment standard not applicable here, the court found that because Reid was evaluated by mental health professionals and was not diagnosed with gender identity disorder nor denied treatment completely, her allegations amounted to a mere disagreement over diagnoses and treatment decisions and were therefore not actionable under § 1983. *Id.*

Here, Hansen claims she has been diagnosed with gender dysphoria and was denied treatment completely. Hansen does not merely claim that she did not agree with the treatment she received. She claims she was diagnosed by Nelson with gender dysphoria and met criteria for GID. Docket 11-1 ¶ 43. Later, Hansen claims that England sent her a letter confirming that her evaluation with Osborne showed that she met the "clinical criteria for gender dysphoria." *Id.* ¶ 75. Hansen claims she notified defendants about her diagnosis and they have failed to respond. *Id.* ¶ 69. Hansen alleges she has "not been offered any of the treatment necessary as a remedy for her disorder and has in fact been denied the assignation of being transgender and suffering from gender dysphoria or gender identity disorder." *Id.* ¶ 81. Thus, Hansen's Eighth Amendment claim against Badure, VanMeveren, Hawk, Wynia, Leslie, Ellis, Ekeren, Young, Eilers, Christensen, Dooley, Fluke, Bowers, Nelson, Turbak, Thelen, England, and Wolfgang survives screening.

### C. Fourteenth Amendment and Equal Protection

"The Equal Protection Clause generally requires the government to treat similarly situated people alike." *Klinger v. Dep't of Corr.*, 31 F.3d 727, 731 (8th Cir. 1994) (citing *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985)). A plaintiff must first demonstrate that she was treated "differently than others who were similarly situated to her." *Id.*; *In re Kemp*, 894 F.3d 900, 909-10 (8th Cir. 2018) (" '[d]issimilar treatment of dissimilarly situated persons does not violate equal protection' " (alteration in original) (quoting *Klinger*, 31 F.3d at 731)).

13

An equal protection violation also requires "an intent to discriminate." *In re Kemp*, 894 F.3d at 910; *see also Henley v. Brown*, 686 F.3d 634, 642 (8th Cir. 2012) ("In the absence of any allegations of intentional discrimination, we therefore concluded the Equal Protection Clause did not provide a ground for relief for appellant's section 1983 race discrimination claim."). An equal protection claim has been recognized through a "class of one" claim where a "plaintiff alleges that [he] has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

Hansen claims that defendants violated the Equal Protection Clause's prohibition against sex-based discrimination when they failed to provide her items that they offer female inmates at the women's prison facilities. Hansen claims she has requested items (makeup, sports bras, female clothing) that the prisoners in the female facility receive and the justification for denying her request was because Hansen did not have a BH order on record for the materials. *See* Docket 11-1 ¶ 62. Here, Hansen has alleged sufficient facts to state a plausible equal protection claim. Thus, this claim survives 1915A screening.

## III. Hansen's "Claim 2"

Hansen claims that defendants Eilers, Christensen, Kaemingk, and Leidholt

> authorized or allowed the use of an ambiguous and too vague Prohibited Act, "V-16" . . . [which] as applied and on its face, denied Plaintiff's rights to freedom of expression, to be free from cruel and

14

unusual punishment[,] due process and equal protection of the laws as guaranteed by the First, Eighth, and Fourteenth Amendments[.]

Docket 11-1 ¶ 86. Hansen claims this violation is "unconstitutional on its face and as applied . . . because it is so vague that Plaintiff cannot possibly know, by reading the rule, what behavior is forbidden or a violation of the institutional/DOC rules." *Id.* ¶ 48. "Each Government official, his or her title withstanding, is only liable for his or her own misconduct. As we have held, a supervising officer can be liable only if he directly participated in the constitutional violation, or if his failure to train or supervise the offending actor caused the deprivation." *Parrish v. Ball*, 594 F.3d 993, 1001 (8th Cir. 2010) (internal quotations omitted).

In *Martin v. Sargent*, the Eighth Circuit held that when a plaintiff argues that a prison policy is unconstitutional, "[i]n order to survive a motion to dismiss, a prisoner need not plead more than that the warden was directly involved in the [policy] decision." 780 F.2d 1334, 1338 (8th Cir. 1985). Hansen claims that individually Eilers, Christensen, Kaemingk, and Leidholt authorized or allowed the use of an unconstitutional policy. At this time, Hansen's second claim against Eilers, Christensen, Kaemingk, and Leidholt survives 1915A screening.

## CONCLUSION

Thus, it is ORDERED:

1. Hansen's motion to amend complaint (Docket 11) is granted.
2. Hansen's claims against defendants in their official capacity for

monetary damages are dismissed without prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1). All other claims survive 1915A screening.

3. The Clerk shall send blank summons forms and Marshal Service Form (Form USM-285) to Hansen so that she may cause the complaint to be served upon defendants.

4. Hansen shall complete and send the Clerk of Courts a separate summons and USM-285 form for each defendant. Upon receipt of the completed summons and USM-285 forms, the Clerk of Court will issue the summons. If the completed summons and USM-285 form are not submitted as directed, the complaint may be dismissed.

5. The United States Marshal Service shall serve the completed summonses, together with a copy of the complaint (Docket 11-1) and this order, upon the defendants.

6. Defendants will serve and file an answer or responsive pleading to the amended complaints and supplement on or before 21 days following the date of service or 60 days if the Defendants fall under Fed. R. Civ. P. 12(a)(2) or (3).

7. The clerk of the court is directed to send a copy of this order to the appropriate official at Hansen's institution.

8. Hansen will keep the court informed of her current address at all times. All parties are bound by the Federal Rules of Civil Procedure and by the court's Local Rules while this case is pending.

Dated October 16, 2019.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE